# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 12, 2025        Decided July 21, 2026

No. 24-1028

SAVE THE SOUND, INC.,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION AND BRYAN BEDFORD,
IN HIS CAPACITY AS ADMINISTRATOR OF THE FEDERAL
AVIATION ADMINISTRATION,
RESPONDENTS

AVPORTS LLC AND TWEED NEW HAVEN AIRPORT
AUTHORITY,
INTERVENORS

———

Consolidated with 24-1029

———

On Petitions for Review of an Order
of the Federal Aviation Administration

———

*Dana Hrelic* argued the cause for petitioners. With her on the briefs were *James T. Shearin*, *Roger Reynolds*, *Jessica Roberts*, and *Dara Illowsky*.

*Rebecca Jaffe*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief were *Adam R.F. Gustafson*, Assistant Attorney General, and *Robert J. Lundman* and *Kevin W. McArdle*, Attorneys.

*W. Eric Pilsk*, *Catherine M. van Heuven*, and *David J. Monz* were on the brief for intervenor Tweed New Haven Airport Authority in support of respondents. *Peter J. Kirsch* entered an appearance.

*Kenneth P. Quinn* and *David F. Knapp* were on the brief for intervenor Avports LLC in support of respondents.

*Kelley J. Halliburton* was on the brief for amicus curiae City of New Haven, Connecticut in support of respondents.

Before: SRINIVASAN, *Chief Judge*, WILKINS and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: The National Environmental Policy Act requires federal agencies to prepare reports discussing the environmental effects of major federal actions. Its requirements are modest, purely procedural, and serve only to facilitate informed agency decision-making. In this case, an environmental group and a town challenge the Federal Aviation Administration's approval of a construction project at a small Connecticut airport. They allege numerous NEPA violations, but their theories would require us to override reasonable agency judgments or explanations. Neither NEPA nor the Administrative Procedure Act permits this, so we deny the petitions for review.

3

I

A

NEPA requires federal agencies to prepare reports on the environmental effects of "major Federal actions." 42 U.S.C. § 4332(2)(C). The report must discuss "reasonably foreseeable environmental effects." *Id.* § 4332(2)(C)(i).

An agency may issue its report in one of two forms. When a project does not have "reasonably foreseeable significant effect[s]" on the environment, an agency must prepare an environmental assessment (EA). 42 U.S.C. § 4336(b)(2). Such an EA must "concise[ly]" set forth the agency's reasons for finding no significant environmental effects. *Id.* If a project is expected to have significant environmental effects, the agency must prepare a longer environmental impact statement (EIS). *Id.* § 4336(b)(1). But neither an EA nor an EIS may go on endlessly. In 2023, Congress prohibited EAs that exceed 75 pages and EISs that exceed 150 pages absent extraordinary circumstances. *Id.* § 4336a(e).

In *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025), the Supreme Court stressed that courts play a modest role in reviewing agencies' NEPA reports. The Court ordered a "course correction … to bring judicial review under NEPA back in line with the statutory text and common sense." *Id.* at 184. This correction was necessary because lower courts had "strayed and not applied NEPA with the level of deference demanded by the statutory text" and judicial precedent. *Id.* at 183. For example, the Court explained that NEPA's "textually mandated focus" is "the 'proposed action'—that is, the project at hand." *Id.* at 186–87 (quoting 42 U.S.C. § 4332(2)(C) (2018)). Therefore, agencies need not evaluate the environmental effects of a "possible future" project or a "geographically distant" one. *Id.* at 187. Similarly,

although NEPA requires "detailed" agency reports, it does not specify what details must be included, and it prohibits bloated reports. *Id.* at 180–81 & n.3. "So the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court." *Id.* at 181. Summing up, the Court held that "the central principle of judicial review in NEPA cases is deference." *Id.* at 179.

Finally, the Court reiterated the settled principle that "NEPA is a purely procedural statute" that "does not require the agency to weigh environmental consequences in any particular way." *Seven County*, 605 U.S. at 173; *see also id.* at 180 ("NEPA imposes no *substantive* constraints on the agency's ultimate decision to build, fund, or approve a proposed project."). An agency therefore may conclude that "other values outweigh the environmental costs" of a project, and we must respect that determination so long as the agency has reasonably explained it. *Id.* at 177–78 (cleaned up).

B

Tweed New Haven Airport is a regional Connecticut airport managed by the Tweed-New Haven Airport Authority. Tweed is one of the most underserved airports in the country. In September 2021, the only airline flying there stopped doing so. As of late 2023, only one airline had stepped in to fill the void—a short-haul carrier called Avelo.

Tweed has no shortage of problems, but two are relevant here. First, its only active runway is too short. At 5,600 feet, it cannot accommodate the weight of full-capacity flights on one of the most common passenger planes—the Boeing 737-800. To comply with the runway's current weight limits, Avelo must reduce the capacity on such flights from 189 to 162 seats. Second, Tweed's passenger terminal is undersized and

outdated. The existing terminal was built as a hangar in 1980 and then converted to a passenger terminal. It is cramped, inefficient, and prone to flooding.

To address these and other problems, the Airport Authority prepared a Master Plan. Running over 250 pages, it laid out proposed upgrades for the next several decades. To target the specific problems noted above, the Authority proposed an expansion project that would (1) extend the runway by roughly 1,000 feet to accommodate 737-800 aircraft at full capacity and (2) build a new passenger terminal.

The Master Plan also proposed to improve Tweed's unusual taxiways. A taxiway is a road for planes to travel between hangars and runways. Tweed's taxiways have atypical signage and acute rather than right-angle connections to the runway. The Airport Authority proposed construction projects to address these taxiway issues. The Authority preliminarily projected that these taxiway upgrades would have significant environmental effects on nearby water or wetlands.

## C

The FAA bifurcates its approval process for airport expansion projects. To start, an airport may seek conditional approval to evaluate whether a proposed project is safe. At this initial stage, the project is still too tentative for environmental review. In the FAA's words, environmental review is "not yet needed and … not ripe for decision." FAA Order 5050.4B (2006) (reprinted at J.A. 762). Later, the airport may seek final approval, which requires NEPA review.

The Airport Authority received conditional approval for all the projects in its Master Plan, but it sought final approval only for the runway extension and new terminal. The FAA treated the runway extension and new terminal as a single

project. It did not consider the taxiway upgrades as part of this project because the Airport Authority had not sought final approval for those upgrades and did not expect to do so in the next five years.

In conducting its NEPA review for the proposed runway extension and new terminal, the FAA received over 900 public comments on a draft EA. In response, the agency updated the draft, prepared a final EA, and concluded that the project would have no significant environmental effects. The FAA thus declined to prepare a full EIS.

In its EA, the agency concluded that the project would reduce air pollution near the airport. The FAA projected that the number of "enplanements" at Tweed—that is, the number of passengers expected to board flights there—would increase from about 350,000 in 2022 to over 1.2 million in 2031. J.A. 79. The FAA attributed this expansion to increased demand and to Avelo's expanding service, growth the agency predicted would occur regardless of whether the project went forward. *See id.* With the runway extension, the FAA projected that Tweed would see fewer flights with more passengers per flight due to the use of full-capacity 737-800s. *Id.* at 79, 684, 710. Without the extension, the FAA projected more flights with fewer passengers per flight due to the reduced capacity. *See id.* On balance, the agency predicted that "overall net emissions for most pollutants" would "decrease" if the project went forward. *Id.* at 684.

The FAA also evaluated flooding-related environmental risks. It recognized that the project would require replacing some floodplains with impervious surfaces like the expanded concrete runway. Because impervious surfaces do not absorb water, rainwater falling on them may carry pollutants into nearby bodies of water. Nonetheless, the FAA found that the

project would have only minimal stormwater runoff effects. For one thing, the Airport Authority would excavate other parts of the property to create new floodplains. J.A. 29–30, 40. Moreover, construction would include infiltration measures allowing water to penetrate or pass man-made surfaces to reach the soil. *Id.* at 31. The project also would include stormwater detention systems to collect rainwater and prevent flooding. *Id.* Finally, the FAA noted the minimal effects on nearby wetlands. *Id.* at 31, 178, 734. The Airport Authority would offset any losses by working with other regulators to create wetlands elsewhere in the state, with preliminary plans to do so near the Airport. *Id.* at 31, 39, 192, 239–40, 437–38, 443, 485.

An environmental group called Save the Sound and the Town of East Haven, Connecticut petitioned this Court for review of the FAA's decision to approve the project. They contend that the EA violates NEPA in several respects. We have jurisdiction under 49 U.S.C. § 46110(a).

## II

Courts review NEPA claims through the Administrative Procedure Act. *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 799 (D.C. Cir. 2022). Judicial review in NEPA cases is especially narrow. "In reviewing the FAA's compliance with NEPA, our role is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 685 (D.C. Cir. 2004) (cleaned up); *see* 5 U.S.C. § 706(2)(A) (arbitrary-and-capricious standard). And as explained above, *Seven County* repeatedly stressed more generally that "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." 605 U.S. at 185.

8

III

The petitioners assert four categories of NEPA claims. We consider each in turn.

A

The petitioners first contend that the FAA impermissibly segmented the project by considering only the proposed runway extension and terminal construction, but not the possible taxiway upgrades. We disagree.

In *Seven County*, the Supreme Court stressed that NEPA's text speaks of "the 'proposed action'—that is, the project at hand." 605 U.S. at 182. So, NEPA never requires an agency to "evaluate the effects of [a] separate project." *Id.* at 187. And it gives agencies wide latitude to define the relevant project: Even "interrelated" projects that are "close in time and place to the project at hand" are not necessarily a single project. *Id.* at 190. Our review "must remain deferential," particularly as to the "gray area in defining the project at hand." *Id.* Even if we conclude that "NEPA would support drawing a different line," we must defer if the agency has drawn a "reasonable and manageable line." *Id.* (cleaned up). According to regulations promulgated by the Council on Environmental Quality, we police this line by considering whether possibly different projects overlap temporally and have substantial independent utility. *See* 40 C.F.R. § 1501.9(e) (2023); *City of Bos. Delegation v. FERC*, 897 F.3d 241, 252 (D.C. Cir. 2018).[1]

---

[1] While this litigation was pending the status of the CEQ regulations implementing NEPA became unsettled. For one thing, this Court concluded that the regulations are *ultra vires*, *Marin Audubon Soc'y v. FAA*, 121 F.4th 902 (D.C. Cir. 2024), though we later characterized our analysis as *dicta*, *Marin Audubon Soc'y v.*

9

Here, the FAA drew a reasonable line at the proposals submitted for final approval—the runway extension and terminal construction. For one thing, the FAA explained, the taxiway project is temporally remote. The Airport Authority does not plan to seek final approval for the taxiway upgrades in the next five years. J.A. 251. Moreover, the respective projects have substantial independent value. The runway and terminal upgrades will provide passengers with better service, regardless of whether the taxiways are upgraded. *Id.* at 104, 110. To be sure, some of the taxiway upgrades might eventually connect to the newly added runway. However, "the fact that other projects might foreseeably be built or expanded in the wake of the current project does not, by itself, make the agency responsible for addressing the environmental effects of those other projects." *Seven County*, 605 U.S. at 189.

The petitioners add that the projects must be connected because the runway extension will require taxiway upgrades to meet FAA safety standards. Specifically, they contend that Tweed needs a full-length taxiway running parallel to its runway. But as the FAA explained, the new runway complies with its design standards with or without the taxiway upgrades. J.A. 740. The FAA requires certain airports to adopt a full-length taxiway to account for specific visibility conditions that

*FAA*, No. 23-1067, 2025 WL 374897, at *1 (D.C. Cir. Jan. 31, 2025) (Srinivasan, C.J., concurring in the denial of rehearing en banc). For another, the CEQ rescinded the regulations. *See* Removal of National Environmental Policy Act Implementing Regulations, 91 Fed. Reg. 618 (Jan. 8, 2026). The parties agree that these developments do not affect this case. Because it makes no difference to the outcome here, we apply the CEQ regulations that were in effect when the FAA issued its decision without considering any possible complications from either *Marin Audubon* or the later rescission. *See Sierra Club v. FERC*, 153 F.4th 1295, 1308 n.7 (D.C. Cir. 2025); *Healthy Gulf v. FERC*, 132 F.4th 544, 549 n.1 (D.C. Cir. 2025).

are unrelated to runway length. *Id.* at 860. The relevant visibility conditions are not known to be present at Tweed. Moreover, even if they were, the FAA permits airports to implement other safety measures instead of building a full-length taxiway. *Id.* at 748, 876. So, neither the runway expansion nor the terminal improvements required the taxiway upgrades to go forward.

For these reasons, the FAA permissibly declined to consider the prospective taxiway improvements as part of the current project.

B

The second objection is a slight variation on the first. The petitioners posit that the FAA ran afoul of NEPA's mandate to consider "reasonably foreseeable environmental effects" of the proposed runway expansion and terminal construction. 42 U.S.C. § 4332(C)(i). Under the regulations in place when the FAA approved the project, agencies had to consider "cumulative effects" of the project—that is, those resulting from the "incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions." 40 C.F.R. § 1508.1(g)(3) (2023). But when a future project is in its early planning stages and the agency lacks "information about its scope," the project is "too preliminary to meaningfully estimate its cumulative impacts." *City of Bos. Delegation*, 897 F.3d at 253 (cleaned up). Instead, possible effects are better analyzed in "later projects" when they "become better known." *Id.* at 254.

Invoking the requirement to consider cumulative effects, the petitioners rehash their argument about the taxiway upgrades. They say the taxiway project is reasonably foreseeable because Tweed's current layout raises safety concerns and the Airport Authority included blueprints for the

upgrades in its Master Plan.  We reject this argument for the reasons already given:  The taxiway project is not required for safety, and there is too much uncertainty surrounding whether the Airport Authority will ever pursue it, and if so in what form.

More generally, the petitioners insist that the FAA arbitrarily ignored reasonably foreseeable future effects by drawing a line at projects expected to occur within five years.  The petitioners invoke *Northern Plains Resource Council, Inc. v. STB*, 668 F.3d 1067 (9th Cir. 2011), where the Ninth Circuit set aside an environmental analysis that did not consider effects more than five years after the approval at issue.  But *Northern Plains* was expressly limited to "the facts presented" in that case, which involved a project beset by decades of delay and construction set to continue for more than five years.  *Id.* at 1078.  This case involves no comparable circumstances; the agency estimated the project would be completed within three years of issuing the EA.  J.A. 21, 25.  And whatever the merits of *Northern Plains* on its facts, *Seven County* prevents us from imposing on the FAA a requirement to consider the effects of a distinct, inchoate project expected to be commenced more than five years after the regulatory approval at issue here.

The petitioners also contend that the FAA failed to adequately consider the effects from Avelo's decision to service Tweed in 2021.  But the FAA did consider that decision as part of its cumulative-effects analysis.  J.A. 250, 708.  The agency factored the effects of Avelo's activities into its baseline model, and it then assessed how the project would affect the baseline.  *Id.* at 79, 399–408, 417.  Indeed, the FAA reasonably concluded that the project would *reduce* most pollutants, by enabling Avelo to accommodate the same passenger demand with fewer flights.  *Id.* at 417, 684.  The petitioners suggest the FAA should have quantified the specific effects from Avelo's activities.  But NEPA does not require

that level of detail. *See Seven County*, 605 U.S. at 180–81. Instead, it is more than enough that the FAA "extensively detailed the existing conditions" at Tweed. *El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 250–51 (D.C. Cir. 2024).

C

The petitioners challenge the FAA's prediction that the project will not cause enplanements at Tweed to increase. Recall that the agency projected enplanements to increase substantially, but for reasons unrelated to the project. And recall its prediction that the project would cause fewer flights with more passengers per flight, thus reducing air pollution.

The petitioners initially object that the FAA failed to use reliable data and disclose its methodology, as required by 42 U.S.C. § 4332(2)(D)–(E). Yet the FAA explained that it based its calculations on the number of projected flights, seats per flight, and percentage of seats filled. J.A. 83, 388–97. It included several pages of analysis with specific numbers based on forecasts from Avelo. Those disclosures ensured that "relevant information is available to those participating in agency decision-making." *Sierra Club v. FERC*, 153 F.4th 1295, 1306 (D.C. Cir. 2025) (cleaned up). And they likewise enabled the public "to understand and consider meaningfully the factors involved." *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 368 (D.C. Cir. 1981) (cleaned up).[2]

---

[2] In their reply brief, the petitioners claim that the FAA should have employed the methodology that the Airport Authority used in the Master Plan. This argument is forfeited because it was not clearly raised in the opening brief. *United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426, 434 (D.C. Cir. 2022). It is also misguided because, as explained below, a reviewing court may rarely if ever override an agency's technical calculations on matters within

Next, the petitioners charge that the FAA ignored the Environmental Protection Agency's request for more details on the enplanement projections. But the FAA did respond to EPA's comments, by adding almost ten pages of fine print to the final EA. J.A. 708–14. The petitioners say this was not enough because the FAA should have treated EPA like a "cooperating agency" formally involved in the project. *See* 42 U.S.C. §§ 4336a(a)(3), 4336e(2). The petitioners do not, and could not, contend that EPA was such a cooperating agency. Regardless, the FAA included at least a reasonable level of detail in the final EA, which is all we may demand of it. *See Seven County*, 605 U.S. at 180–81.

The petitioners lodge several specific objections about the economic or technical assumptions underpinning the flight projections. Such claims are difficult to sustain given the deferential nature of judicial review for arbitrariness, both under the APA in general and in NEPA cases in particular. Even before *Seven County*, distinguished judges on our Court had made this point repeatedly. *See, e.g.*, *Friends of the River v. FERC*, 720 F.2d 93, 102 (D.C. Cir. 1983) (R.B. Ginsburg, J.) (resolution of issues requiring "technical expertise ... is properly left to the informed discretion of the responsible federal agency"); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991) (Thomas, J.) (when analysis "requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies" (cleaned up)); *Sierra Club v. EPA*, 353 F.3d 976, 991 (D.C. Cir. 2004) (Roberts, J.) (same); *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 336 (D.C. Cir. 2014) (Kavanaugh, J.) (noting the "extreme degree of deference to the agency when it

---

its expertise, let alone require a federal agency to use the methodology of a particular non-federal entity.

is evaluating scientific data within its technical expertise" (cleaned up)).

Specifically, the petitioners challenge the FAA's conclusion that the number of enplanements would remain constant with or without the project. In their view, the project will provide Tweed with more flight capacity, attracting more passengers and potentially even more airlines. This line of objection runs into several problems.

First, the petitioners rely on flight projections in the Master Plan, which predated Avelo's decision to service Tweed. By the time the FAA had conducted its NEPA analysis, these projections were outdated and wildly inaccurate. For instance, the Master Plan projected at most around 114,000 enplanements in 2022, J.A. 984, but the actual number of enplanements for that year was about 350,000, *id.* at 79. Under these circumstances, the FAA reasonably used newer data.

Second, the petitioners flag possibilities that the FAA reasonably discounted as unlikely. They argue that the runway extension will likely attract new airlines to Tweed. But as the FAA explained, there were "no firm proposals from other carriers to serve" that airport. J.A. 68. And even if other airlines did enter the market, the FAA did not expect enplanements to change because new carriers would compete with Avelo for a share of the same passengers. *Id.* at 718. We must afford substantial deference to the FAA's predictive judgment about enplanements. *St. John's United Church of Christ v. FAA*, 550 F.3d 1168, 1172 (D.C. Cir. 2008); *see also Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc). And even if a professional economist could contest the agency's conclusion, the petitioners have given us no reason to doubt it. Along the same lines, the petitioners argue that the runway extension will likely support new, long-distance flights

to the West Coast. But as the FAA explained, Avelo's CEO noted that the carrier had "no plans in the near term or even in the intermediate term" to add such flights. J.A. 552. And in any event, the FAA's models did account for possible flights to the West Coast. *Id.* at 391–92.

Third, the petitioners grasp at statements from judicial decisions not involving the project under review. They cite a Second Circuit decision addressing whether federal law preempted a Connecticut statute regulating runway length. *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65 (2d Cir. 2019). In a background sentence without citations, that Court stated that an extension "would also allow Tweed to attract more carriers." *Id.* at 69. A general background statement in a judicial opinion that is immaterial to the question presented is hardly a sound basis for later overriding an agency's "predictive and scientific judgments" during a NEPA review challenged in a different case. *Seven County*, 605 U.S. at 181. Likewise, the petitioners cite a Ninth Circuit decision, *Barnes v. DOT*, 655 F.3d 1124 (9th Cir. 2011), for the proposition that runway upgrades tend to induce more passenger demand. But *Barnes* faulted the FAA for failing to consider whether a new runway would increase demand at an airport operating at its maximum acceptable capacity. *Id.* at 1128, 1136–38. That case has little to say about whether, on this record, the FAA reasonably concluded that the extension of an existing runway, at an airport operating well below its maximum acceptable capacity, would likely increase overall demand.

Because the FAA's enplanement projections were reasonably supported and explained, we reject the petitioners' various challenges to them.

16

D

Finally, the petitioners fault the FAA for failing to adequately consider environmental effects related to flooding, runoff, and wetlands. Again, we disagree.

The petitioners assert that the project, which requires replacing some floodplains with impervious surfaces, will likely increase nearby flooding. However, the FAA reasonably explained that the Airport Authority would offset the loss of floodplains by excavating lands around the airport to create new ones and by taking various other mitigating measures. J.A. 29–30, 40, 241–47. In fact, the FAA laid out far more detailed mitigation plans than the ones at issue in the main case on which the petitioners rely. *See Wyo. Outdoor Council Powder River Basin Res. Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1252 (D. Wyo. 2005).

Similarly, the petitioners argue that the FAA failed to analyze the effects of stormwater pollution on nearby surface waters and wetlands. They claim that the FAA failed to give sufficient detail about mitigation measures, but the agency thoroughly considered this issue. It mentioned stormwater detention and filtering systems that Tweed would install at the new terminal, noted construction plans to allow for rainwater infiltration, and pointed to a state permitting program that Tweed has complied with and must continue to satisfy. J.A. 31, 39, 178, 192, 698–99, 729, 744. This case is thus easily distinguishable from *American Rivers v. FERC*, 895 F.3d 32 (D.C. Cir. 2018), where we faulted an agency for not discussing mitigation in any detail, leaving it "as TBD." *Id.* at 54 (cleaned up). Furthermore, the FAA explained, this project was designed to minimize any effect on wetlands. In particular, it avoided nearly half of the relevant wetlands and directly affected largely low-value, inland wetlands comprised of

grasses in areas of Tweed that had been filled with artificial materials in the 1930s. J.A. 30–31, 103, 234–35, 423–24, 431. Though some commenters speculated that the project may prevent additional wetlands from forming naturally, the FAA discounted that possibility as "very unlikely" given the location of the project and the existing wetlands. *Id.* at 728. We cannot say that this predictive, technical judgment was unreasonable.

Despite these measures, the petitioners fault the agency for failing to consider indirect effects on nearby tidal wetlands. But an agency has broad latitude to decide "how far to go in considering indirect environmental effects from the project at hand." *Seven County*, 605 U.S. at 182. And here, the FAA reasonably explained its view that there would be no such effects. According to the petitioners, if inland wetlands cannot soak up pollutants in stormwater, tidal wetlands will face increased damage. The FAA rejected this contention and explained that mitigation measures would substitute for the inland wetlands' minor, relevant function. J.A. 235, 437–38.

Finally, the petitioners claim that the FAA failed to consider the full benefits the wetlands provide. The FAA explained that the wetlands at issue are largely low-quality ones. J.A. 31, 191, 235. Only one wetland has any nutrient-related functions, and it had already been filled with unnatural construction materials. *Id.* at 235, 688, 702. Further, the FAA emphasized that Tweed must coordinate with state regulators to mitigate the project's wetlands effects. *Id.* at 437–38. The petitioners again say this analysis was light on details. Yet the FAA undertook to coordinate with state regulators to ensure "no-net-loss" of wetlands, and it gave specifics about preliminary locations and strategies. This substantive undertaking, made after considering the relevant environmental considerations, well exceeds the process and deliberation that NEPA requires.

18

IV

In sum, the FAA reasonably defined the project, addressed its possible environmental effects, discussed measures the Airport Authority would take to mitigate such effects, and concluded the project would have no significant environmental effects.  An agency can always include more detail and more robust explanations in its EA or EIS.  But as we recently explained, "the era of searching NEPA review is over." *Sierra Club*, 153 F.4th at 1311.  Under *Seven County*, we must determine only whether the agency acted within a broad range of reasonableness.  Because the FAA did so here, we deny the petitions for review.

*So ordered.*